UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SUNRISE FOODS INTERNATIONAL INC., <br><br> Plaintiff, <br><br> v. <br><br> RYAN HINTON INC., <br><br> Defendant. | Case No. 1:17-CV-00457-CWD <br><br> **MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Currently pending before the Court is Plaintiff's motion for summary judgment, filed on April 3, 2019. (Dkt. 30.) Defendant did not respond to the motion and it is ripe for the Court's determination. Having reviewed the record, the Court finds the facts and legal arguments are adequately presented in the brief and record. Accordingly, in the interest of avoiding delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the motion will be decided on the record before this Court. Dist. Idaho L. Rule 7.1(d). For the reasons that follow, the Court will grant Plaintiff's motion for summary judgment.[1]

---

[1] All parties have consented to the jurisdiction of a United States Magistrate Judge to hear and decide all matters in this case. (Dkt. 11.)

**MEMORANDUM DECISION AND ORDER - 1**

# PROCEDURAL HISTORY

On November 3, 2017, Sunrise Foods International, Inc. (Sunrise) filed a complaint against Ryan Hinton Inc. (Hinton). (Dkt. 1.) The complaint alleges Hinton breached its contract with Sunrise by not accepting and paying for a specified amount of certified organic corn. (*Id*.) Hinton filed an answer on November 28, 2017. (Dkt. 6.) On April 13, 2019, Sunrise filed its motion for summary judgment. (Dkt. 30.)

Shortly thereafter, Hinton's attorney of record requested to withdraw. (Dkt. 31.) The Court granted the motion to withdraw, notified Hinton of its obligation to secure counsel in accordance with D. Idaho L. Rule 83.4(d), and informed Hinton that its failure to appear through newly-appointed counsel would be grounds for entry of default against it without further notice. (Dkt. 32-35.) Hinton did not respond. The Clerk entered a notice of default against Hinton on May 21, 2019. (Dkt. 38.) The Clerk entered default on May 21, 2019, per Fed. R. Civ. P. 55(a), and notice of the same was mailed to Hinton's last known mailing address. (Dkt. 36 - 40.) The Court now considers Sunrise's motion for summary judgment. (Dkt. 36.)

# FACTS

1. **Contract Formation**

Sunrise is a Canadian corporation with its principal place of business in Saskatoon, KS, Canada. Compl. ¶ 1. Hinton is an Idaho corporation owned by Mr. Ryan Hinton. Bolinger Decl. Ex. A, Hinton Dep. 12. (Dkt. 30-2 at p. 6.) Hinton is primarily a trucking company, delivering agricultural commodities and animal feed to area farmers.

Bolinger Decl. Ex. 9. (Dkt. 30-3 at p. 22.) Sunrise sells certified organic corn. Pl.[s] Mot. Summ. J. (Dkt. 30-1 at p. 2.)

Hinton entered into a contract with Sunrise in November of 2015, specifying Hinton agreed to purchase 6,000 short tons of certified organic corn from Sunrise. (Dkt. 30-3 at p. 22.) Under the terms of the contract, Hinton would send a truck to load 500 tons of corn from ports in the Pacific Northwest each month.[2] *Id*. Each short ton of corn was worth $415.00. *Id*. The contract totaled $2,490,000.00. *Id*. The contract period began the week of October 1, 2015, and ended on September 30, 2016.[3] *Id*. Because Hinton was in turn selling the corn to organic dairy farmers to be used as cattle feed, the contract specified the vomitoxin level in the corn purchased from Sunrise could not exceed two parts per million. ("2 ppm"). [4] (Dkt. 30-2 at p. 8.)

## 2. Vomitoxin Found in the Corn

On December 15, 2015, Sunrise's chief executive officer, Mr. Jacob Neufeld, notified Ryan Hinton, the owner and President of Hinton, Inc., that some of the corn at Sunrise's Longview, Washington pickup site contained vomitoxin, but that the exact levels were unknown.[5] (Dkt. 30-2 at p. 17.) Mr. Neufeld informed Mr. Hinton that

---

[2] The pick-up location later changed from Portland, Oregon to Longview, Washington. (Dkt. 30-2 at p. 9.)
[3] Due to Sunrise's difficulties unloading the corn at the port, Hinton began picking up the corn after October of 2015. *Id*.
[4] Vomitoxin is a type of mold present in almost all grain products. Neufeld Decl. ¶ 5. (Dkt. 30-7 at p. 2.) The Food and Drug Administration (FDA) has issued advisory levels for vomitoxin that set an acceptable threshold for dairy cattle feed at 10 ppm, with the total ratio of feed to not exceed 5 ppm. *Id*. at p. 3. A vomitoxin level of 2 ppm is within the FDA advisory guidelines. *Id*.
[5] The results of tests taken in January of 2015 showed the vomitoxin levels contained in the corn were less than 0.02 ppm. *Id*. at p. 12.

**MEMORANDUM DECISION AND ORDER - 3**

additional testing had been ordered. (*Id.* at p. 18.) He gave Mr. Hinton the option to wait for the test results, or, Sunrise could provide Hinton with different corn from the "Midwest". [6] (*Id.*) Mr. Hinton elected to delay the corn pickup. (Dkt. 30-3 at p. 23.)

On December 16, 2015, Mr. Neufeld offered to supply corn from another area of the storage facility, and suggested the industry custom of blending corn with higher vomitoxin levels with corn that had lower levels to "hide" the vomitoxin. (*Id*. at p. 33.) Mr. Hinton responded that his customers were "scared to death of [vomitoxin]." *Id*.

On December 22, 2015, Mr. Hinton visited Sunrise's Longview storage facility and visually inspected the corn. (Dkt. 30-2 at p. 21.) He decided he did not want the corn because of visible mold on the piles of corn. (*Id*. at p. 24.) The next day, Sunrise received the test results for vomitoxin which showed only some areas at its Longview facility had vomitoxin levels higher than 2 ppm. (Dkt. 30-7 at p. 4.) There were also areas of corn where the vomitoxin levels met the FDA standard for blending, which would have made it possible for Sunrise to supply Hinton with corn below the contract threshold of 2 ppm. (*Id*. at p. 3.) Afterward, Hinton picked up four loads of corn from the Longview storage facility on January 4, 11, 13, and 19, 2016. *Id*.

   3. **Breach of Contract**

After January 19, 2016, Hinton stopped picking up corn from Sunrise. (*Id*.) Around the same time, Hinton contracted to purchase 5,000 tons of organic corn from High Caliber Transloading & Storage, Inc. ("High Caliber"). Zuidema Decl. ¶¶ 6-7. (Dkt.

---

[6] The contract contained a provision where Sunrise could substitute corn from its Canadian locations with corn from domestic sources if needed. (Dkt. 30-3 at p. 22.)

**MEMORANDUM DECISION AND ORDER - 4**

30-10 at p. 2.) Hinton paid High Caliber between $350 and $410 per short ton of organic corn. Bolinger Decl. Ex. C-1. (Dkt. 30-4 at p. 2-25; 1-24.) The pickup period began in December of 2015 and ended in October of 2016. (*Id.*) Sunrise attempted to contact Hinton multiple times during this same period, leaving voicemails where Sunrise offered different pickup locations, to adjust the price of the corn, to discuss Hinton's dissatisfaction, and eventually, to notify Hinton of its outstanding account balance owed to Sunrise.[7] Harris Decl. ¶ 2. (Dkt. 30-8 at p. 5.)

On September 22, 2016, Mr. Hinton left Mr. Neufeld a voice message stating he wanted to "discuss the corn deal." (Dkt. 30-7 at p. 39.) On September 30, 2016, the contract term ended. (Dkt. 30-3 at p. 22.) On October 4, 2016, Mr. Neufeld left Mr. Hinton a voice message, saying "we still expect you to take the tonnage. Specifically, we had very little communication from about I think January onward from you despite trying to get ahold of you...." (Dkt. 30-7 at p. 41.) On November 29, 2016, Sunrise received a letter from Hinton via its attorney, stating it did not take delivery of the remaining corn under the contract because the corn did not meet the specified vomitoxin levels. (Dkt. 30-6 at p.2-3.)

---

[7] In his declaration, Mr. Neufeld indicates he also emailed Mr. Hinton on September 1, 2016, offering to provide corn from an alternate location, to deliver corn to a location of Hinton's choosing, and to discuss solutions if Mr. Hinton was dissatisfied. (Dkt. 30-7 at p. 37.) Yet, the exhibit referred to is a May 2, 2016 email from Jesse Strom about the outstanding balance on the contract. (*Id.*) Mr. Neufeld states that he warned Mr. Hinton that if he did not get a response before the contract term ended on September 30, 2016, Sunrise would be left with no choice but to sell the corn on the market and pursue legal remedies against Hinton. (*Id.*) This statement is absent in Dkt. 30-7.

**MEMORANDUM DECISION AND ORDER - 5**

## 4. Damages

Hinton picked up and paid for 334 tons of corn from Sunrise's storage facilities. (Dkt. 30-8 at p. 2.) Sunrise sold the remaining 5,666 tons of corn specified under the contract to other customers at a loss of $113,806.00, because the market price for organic corn dropped after the contract with Hinton was consummated.[8] (*Id.* at p. 2-3.) Sunrise states that it structures its prices to make a profit of $30.00 per short ton sold. (*Id.*) Based on these facts, Sunrise moved for summary judgment and an award of damages in the amount of $453,766.00.

Sunrise argues that, because its price structure ensures a profit of $30.00 per short ton sold, it is entitled to receive additional damages for lost profits in the amount of $169,980.00.[9] (Dkt. 30, at p. 10.) Sunrise also argues it qualifies as a "lost volume seller," because it would have made a profit of $169,980.00 on the corn sold to the other diaries had it not sold the corn originally intended for Hinton to them. (*Id.*) In total, Sunrise argues it suffered damages in the amount of $453,766.00 as a direct and proximate result of Hinton's breach of contract. (*Id.* at p. 16.)[10]

---

[8] Specifically: 1,200 short tons to Bar Ale, Inc. at $380 per ton; (Dkt. 30-8 at p. 15); 4,000 short tons to Sunrise Organic Dairy at $399 per ton; and another 136 tons at $394 per ton a few months later. (*Id.* at pp. 12, 14) The last 330 short tons were sold to Conway Feed, Inc at $400 per ton. (*Id.* at p. 13.)
[9] 5,666 x $30.00 = $169,980.00
[10] $113,806.00 + $169,980.00 + $169,980.00 = $453,766.00

**MEMORANDUM DECISION AND ORDER - 6**

## STANDARD OF REVIEW

1. **Summary Judgment Standard**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, and other matters presented to the court show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A genuine issue of material fact will be absent if, upon "viewing the evidence and inferences which may be drawn therefrom in the light most favorable to the adverse party, the movant is clearly entitled to prevail as a matter of law." *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008); *see also*, *Mutual Fund Investors, Inc. v. Putnam Management Co., 563 F.2d 391, 393* (9th Cir. 1077)).

Local Rule 7.1(e), governing motion practice in this Court, provides, "[i]n the event an adverse party fails to file any response documents required to be filed under this rule in a timely manner, such failure may be deemed to constitute a consent to the . . . granting of said motion." When a party does not have legal representation, the Court of Appeals for the Ninth Circuit has held "an ordinary pro se litigant, like other litigants, must comply strictly with the summary judgment rules." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018).

However:

> [a] district court may not grant a motion for summary judgment simply because the nonmoving party does not file opposing material, even if the failure to oppose violates a local rule. However, when the local rule does

> not require, but merely permits the court to grant a motion for summary judgment, the district court has discretion to determine whether noncompliance should be deemed consent to the motion.

*Brydges v. Lewis*, 18 F.3d 651, 652 (9th Cir. 1994) (internal citations omitted). The Ninth Circuit has also determined that such "discretion, however, is necessarily abused when exercised to grant a motion for summary judgment where the movant's papers are insufficient to support that motion or on their face reveal a genuine issue of material fact." *Henry v. Gill Industries, Inc.*, 983 F.2d 943, 949 (9th Cir. 1993).

The Court, in the exercise of its discretion, determines that an examination of the merits of Sunrise's claims, and its entitlement to the damages it seeks, is warranted under Fed. R. Civ. P. 56(a). What follows is the Court's examination of all materials filed in the record to date in its determination of Sunrise's motion for summary judgment.

## DISCUSSION

**1.      Applicable Law – The United Nations Convention on Contracts for the International Sale of Goods ("CISG")**

Sunrise, a Canadian corporation, asserts that the provisions of the CISG apply to its agreement with Hinton. The CISG applies if the parties are incorporated in signatory countries, the contract does not explicitly opt out of the CISG, and the contract is for the sale of goods. CISG, Art. 1, 6, (April 1980).[11] Hinton was incorporated in Idaho. The United States became a signatory to the CISG in 1988, and Canada became one in

---

[11] The CISG has been reprinted at 15 U.S.C. App'x (1998).

1992.[12] The contract does not opt out of the CISG, and it was for the sale of a good—organic corn—purchased for commercial use. *See* CISG Art. 2 (A good under the CISG cannot be a product purchased for "personal, family, or household use.…") Sunrise has therefore established that the CISG applies.[13]

The United States Court of Appeals for the Ninth Circuit has not had occasion to consider disputes arising under contracts governed by the CISG, but other circuit courts have, analogizing it as the "international analogue to Article 2 of the Uniform Commercial Code." *Chicago Prime Packers, Inc. v. Northam Food Trading Co.,* 408 F.3d 894, 898 (7th Cir. 2005); *Dingxi Longhai Dairy, LTD. v. Becwood Technology Group L.L.C.*, 635 F.3d 1106, 1107 (8th Cir. 2011); *Delchi Carrier Spa v. Rotorex Corp.*, 71 F.3d 1024, 1107 (2d Cir. 1995). Therefore, "caselaw interpreting analogous provisions of Article 2 of the [U.C.C.], may… inform a court where the language of the relevant CISG provision tracks that of the U.C.C." *Dingxi*, 635 F.3d at 1107. In addition, Article 7 of the CISG provides that a court may consider case law applying the UCC when interpreting corresponding provisions of the CISG. On the other hand, "UCC caselaw is not per se applicable." *Chicago Prime*, 408 F.3d at 898.

---

[12] President Reagan submitted the Convention to the Senate, which ratified it. (*See* Public Notice 1004, U.S. Ratification of 1980 United Nations Convention on Contracts for the International Sale of Goods; Letter of Transmittal from President Reagan to the Senate of the United States (Sept. 21, 1983)); "There is no doubt that the Convention is valid and binding federal law." *Chateau des Charmes Wines Ltd. v. Sabate USA Inc.*, 328 F.3d 528, 530 (9th Cir. 2003).

[13] According to 28 U.S.C. § 1331(a), the Court has subject matter jurisdiction over civil actions that arise under a treaty of the United States such as the CISG. The Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), in that this is a civil action between Sunrise, a Canadian citizen, and Hinton, an Idaho citizen, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

## 2. Contract Formation Under the CISG

Under the CISG, a claimant must plead the traditional four elements of a breach of contract claim: formation, performance, breach, and damages. *Dingxi*, 635 F. 3d at 1108. Article 14(1) provides that a contract is enforceable if it is "sufficiently definite and indicates the intention of the offeror to be bound in case of acceptance." An offer is sufficiently definite if it includes a description of the goods and expressly fixes quantity and price. CISG Art. 14(1).

Here, the contract between Sunrise and Hinton included a description of the goods (certified organic corn), a fixed quantity of 6,000 short tons, and a price of $415 per short ton. (Dkt. 30-3 at p. 22.) "A statement made by or other conduct of the offeree indicating assent to an offer is acceptance." CISG Art. 18(1). Here, both parties expressed their intent to be bound and indicated assent respectively when they executed the contract and later performed. (Dkt. 30-3 at p. 22.) Therefore, Sunrise has established that an enforceable contract was formed.

## 3. Wrongful Rejection of Corn

Under Article 35(1)-(2)(a) of the CISG, "the seller must deliver goods which are of the quantity, quality and description required by the contract," and "the goods do not conform with the contract unless they are fit for any particular purpose expressly or impliedly made known to the seller at the time of the conclusion of the contract.…" Article 36 further provides "[t]he seller is liable in accordance with the contract and this Convention for any lack of conformity."

The buyer also has a duty under Article 35 to "pay the price for the goods and take delivery of them as required by the contract and this convention." A buyer breaches the contract when it refuses delivery or refuses to pay for conforming goods. *BP Oil Intern., Ltd. v. Empresa Estatal Petroleos de Ecuador*, 332 F.3d 333, 338 (5th Cir. 2003). Further, under Article 35(2), the buyer bears the burden of demonstrating the nonconformity of the goods as an affirmative defense to non-payment. *Chicago Prime Packers, Inc. v. Northram Food Trading Co.*, 408 F.3d 894, 898 (7th Cir. 2005).

If a breach of contract is considered "fundamental" under Article 49, the injured party may seek damages. A breach of contract is fundamental "if it results in such detriment to the other party as substantially to deprive him of what he is entitled to expect under the contract, unless the party in breach did not foresee and a reasonable person of the same kind in the same circumstance would not have foreseen such a result." CISG Art. 25.

The evidence in the record indicates the corn at the Longview Storage Facility contained vomitoxin. However, the evidence indicates Sunrise offered Hinton certified organic corn that would have met the 2 ppm stipulated in the contract in three ways: by providing corn from a different location in the storage facility; by blending in accordance with industry custom; or, providing corn from a different storage facility altogether. (Dkt. 30-7 at p. 3.) Therefore, the undisputed facts establish that the goods offered by Sunrise to Hinton conformed to the contract terms.

The undisputed facts further establish that Hinton failed to fulfill its obligations under the contract, because it took delivery of and paid for only 334 tons of corn, not the

**MEMORANDUM DECISION AND ORDER - 11**

6,000 tons specified in the contract. (Dkt. 30-8 at p. 2.) Hinton has not offered facts establishing that the remaining 5,666 tons of corn were nonconforming. Last, Sunrise has established a fundamental breach because Sunrise did not receive what it was entitled to expect under the contract, and there are no facts in the record establishing Hinton would not have foreseen such a result.

### 4. Wrongful Rejection of Attempts to Cure

There is some evidence in the record suggesting that Hinton may have rejected delivery of the remaining corn because it did not conform to the terms of the contract requiring vomitoxin levels of less than 2ppm. Bolinger Decl. Ex. A, Hinton Dep. at 95:9-96:2.[14] Article 37 of the CISG states "the seller . . . may…deliver goods in replacement of any non-conforming goods delivered or remedy any lack of conformity in the goods delivered, provided that . . . this . . . does not cause the buyer unreasonable inconvenience or unreasonable expense. . . ." Similarly, the U.C.C. states "where any tender or delivery by the seller is rejected because nonconforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery." U.C.C. § 2-508(1).

Even if the corn offered to Hinton in December of 2015 was nonconforming because of high levels of vomitoxin, Sunrise had the option to cure and offer conforming

---

[14] Taking all evidence in the record in a light most favorable to Hinton, an inference can be drawn that Hinton refused the corn because his customers had informed Hinton not to bring them Sunrise's product once they heard about the vomitoxin levels. *Id.* Sunrise received also a letter from Hinton via its attorney, stating Hinton did not take delivery of the remaining corn under the contract because it exceeded the specified vomitoxin levels. (Dkt. 30-6 at p.2-3.) There is, however, no evidence in the record that the vomitoxin levels in the corn were excessive.

**MEMORANDUM DECISION AND ORDER - 12**

goods prior to the expiration of the contract term. Sunrise offered Hinton corn which conformed to the contract terms on three separate occasions, but Hinton did not accept any of these offers. (Dkt. 30-7 at p. 3.) These undisputed facts establish Hinton wrongfully rejected Sunrise's attempts to cure. *See T.W. Oil, Inc. v. Consol. Edison Co. of New York*, 443 N.E.2d 932, 937 (Ny. Ct. App. 1982) (holding under U.C.C. § 2-508 that a seller who tenders nonconforming goods to a buyer who then properly rejects them may avail itself of the cure provision within a reasonable amount of time after rejection).

Sunrise has established there is no genuine dispute as to any material fact that Hinton breached the terms of an enforceable contract to purchase 6,000 tons of organic corn at the price of $415.00 per short ton. The remaining issue is the measure of damages that will compensate Sunrise for its loss.

### 5. Damages

An award of damages is meant to "place the injured party in the same economic position he would have been in if the contract had been performed." Secretariat Commentary on the CISG 1978 Draft; U.C.C. § 1-305(a). The Ninth Circuit is in accord with this general principle. *S & R Metals, Inc. v. C. Itoh & Co. (Am.)*, 859 F.2d 814, 818 (9th Cir. 1988).

Under the CISG, damages are calculated under Articles 74 through 76. Article 74 awards actual losses and loss of profits to the aggrieved party:

> Damages for breach of contract by one party consist of a sum equal to the loss, including loss of profit, suffered by the other party as a consequence of the breach. Such damages may not exceed the loss which the party in breach foresaw or ought to have foreseen at the time of the conclusion of the contract, in

> the light of the facts and matters of which he then knew or ought to have known, as a possible consequence of the breach of contract.

*See also* U.C.C. § 2-708 ("the measure of damages is the profit . . . which the seller would have made from full performance by the buyer. . . .").

Once actual loss, including lost profits, are calculated under Article 74, the Court next looks to either Article 75 or 76. Article 75 applies when the seller has resold the goods within a reasonable time, akin to the concept of cover under the U.C.C. *See* U.C.C. § 2-706. Article 76 applies when there has been no resale of the product. Here, Sunrise resold the goods, and therefore the Court must apply Article 75, which provides:

> If the contract is avoided and if, in a reasonable manner and within a reasonable time after avoidance, . . . the seller has resold the goods, the party claiming damages may recover the difference between the contract price and the price in the substitute transaction as well as any further damages recoverable under Article 74.

Here, Hinton contracted to purchase 6,000 tons of corn at $415.00 per short ton, for a total price of $2,490,000.00. (Dkt. 30-3 at p. 22.) Hinton purchased 334 tons, and paid Sunrise $138,610.00. (Dkt. 30-8 at p. 2.) $2,351,390.00 remained owing under the contract.[15] (*Id.*)

---

[15] $2,490,000-$138,610 = $2,351,390.00

Sunrise "covered" and sold the 5,666 tons of corn meant for Hinton to other buyers, receiving $2,237,584.00. (Dkt. 30-8 at p. 15.) Applying Article 74 and 75 results in an amount of loss of $113,806.00. Sunrise has established this amount in damages.[16]

Sunrise argues, however, that it is entitled to additional damages in the form of lost profits, based upon its profit margin of $30.00 per short ton. (Dkt. 30-8 at p. 3.) In other words, had Hinton purchased the entire 6,000 short tons of corn, Sunrise expected a profit of $180,000.00. According to its logic, Sunrise received a profit of $10,020.00 from the corn Hinton actually purchased, and Sunrise is therefore entitled to the difference of $169,980.00 in damages for the breach of contract.

Sunrise's logic does not comply with the CISG, however, because it has not explained why the measure of damages provided for by Articles 74 and 75 is inadequate to put Sunrise in the position that it would have been in had the contract with Hinton been performed fully. An injured party cannot be put in a better position than it would have enjoyed if the contract had been properly performed. CISG-AC Opinion No. 6, Calculation of Damages under CISG Article 74, Cmt. 9; CISG-AC Opinion No. 8, Calculation of Damages under CISG Articles 75 and 76. Sunrise expected to make a profit of $30.00 per short ton, which was accounted for in the $415.00/ton price Hinton agreed to pay. That same $30.00 per short ton is accounted for in the loss calculation,

---

[16] Under Article 74, if there has been a breach of contract and the aggrieved party enters into a reasonable substitute transaction, the aggrieved party may recover damages equating to "the difference between the contract price and the substitute transaction." CISG-AC Opinion No. 6, Calculation of Damages under CISG Article 74.

**MEMORANDUM DECISION AND ORDER - 15**

above, just as it was in the $415.00/ton price. Therefore, Sunrise cannot establish its entitlement to an additional $169,980.00 in damages.

Next, Sunrise claims additional damages due to its status as a lost volume seller. A lost volume seller is "one who would have sold its goods to the original buyer, as well as alternative buyers due to a surplus of goods." *Sunrich Inc. v. Pac. Foods of Oregon, Inc.*, 2004 WL 1124495, at *1 (D. Or. May 20, 2004). Sunrise claims that it would have realized further profits of $169,980.00 because, had there been no breach by Hinton, Sunrise could and would have had the benefit of both the original contract and the resale contract. A seller such as Sunrise has the burden to show "it could have supplied both the breaching purchaser and the resale purchaser." *Islamic Republic of Iran v. Boeing Co.*, 771 F.2d 1279, 1290 (9th Cir. 1985). In addition, Sunrise bears the burden of proving it would have "completed sales to alternative buyers that [it] would have completed even in the absence of a breach." *Id*. In such a case, the measure of damages "should be the dealer's profit on one sale." CISG-AC Opinion No. 6, Calculation of Damages under CISG Article 74, Cmt. 3.20, 3.21.[17]

Sunrise has not met its burden of proof. While Sunrise may have had access to surplus corn, nothing in the record establishes Sunrise would have sold corn to other dairies in the absence of a breach by Hinton. (Dkt. 30-8 at pp. 12-15.) Further, if the Court were to award the lost profit damages Sunrise claims for both the Hinton contract

---

[17] The CISG provides, however, that "an aggrieved party may not recover lost profits for lost volume under Article 74 and, in addition, damages under Article 75"'s substitute transaction formula because, in that circumstance, the aggrieved party would receive double recovery." *Id*., Cmt. 3.22.

and the secondary contracts, Sunrise would be placed in a better position than it would have been upon full performance of the contract by Hinton. *See* CISG-AC Opinion No. 6, Calculation of Damages under CISG Article 7 4, Cmt. 3 .22.

Sunrise has not established entitlement to an award of damages greater than its actual damages in the amount of $113,806.00.

6. **Agency/Contract Modification Defense**

There is some evidence in the record suggesting Mr. Hinton was under the impression his company satisfied the contract with Sunrise by purchasing corn from High Caliber. (Dkt. 30-2 at p. 13.)[18] However, there is no factual basis for this defense. Nothing in the record establishes that High Caliber was acting on Sunrise's behalf, and the undisputed facts indicate High Caliber was a separate entity. (Dkt. 30-10 at p. 2.) And, all invoices sent to Hinton identified High Caliber, not Sunrise, as the seller. (Dkt. 30-4 at p. 2-25.)

---

[18] Mr. Hinton testified that he "assumed" High Caliber, a separate entity from Sunrise, was providing the corn on behalf of Sunrise.

## CONCLUSION

Based upon a thorough review of the record, the Court finds no genuine dispute as to any material fact upon which Sunrise seeks summary judgment. Sunrise has established the requisite elements for breach of contract under the CISG, including actual damages in the amount of $113,806.00. However, Sunrise has not established entitlement to any further award of damages, either in the form of additional lost profits or as a lost volume seller.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1) Plaintiff's Motion for Summary Judgment (Dkt. 30) is **GRANTED**.

2) Plaintiff may make application for entry of default judgment in accordance with the Court's memorandum decision and Fed. R. Civ. P. 55(b)(2).

DATED: August 8, 2019

Honorable Candy W. Dale
United States Magistrate Judge